| | | |
|---|---|---|
| HAROLD BOZARTH, JR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:11-CV-00901 |
| v. | ) | Judge Wiseman/Brown |
| MICHAEL ASTRUE, COMMISSIONER | ) | |
| FOR SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

To: The Honorable Thomas A. Wiseman, Jr., Senior United States District Judge

## REPORT AND RECOMMENDATION

This action was brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Social Security Administration (SSA), through its Commissioner ("the Commissioner"), denying the plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. § 1382, 1382c. For the reasons explained herein, the undersigned **RECOMMENDS** that the plaintiff's Motion for Judgment on the Record (DE 13) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

## I. PROCEDURAL HISTORY

The plaintiff protectively filed an application for DIB and SSI on January 7, 2009, claiming that he had been disabled since July 20, 2008. (DE 10, pp. 109-17, 123) The plaintiff claimed that he was disabled because of heart failure, blood sugar, memory loss, and blood pressure problems. (DE 10, p. 134) The plaintiff's applications for benefits were denied on May 12, 2009. (DE 10, pp. 68-71)

Attorney Bill Kaludis was appointed to represent the plaintiff on June 11, 2009. (DE 10, pp. 73-74) The plaintiff filed a request for reconsideration through counsel on June 16, 2009. (DE 10,

p. 75)  The plaintiff's request for reconsideration was denied on August 6, 2009.  (DE 10, pp. 76-79)

The plaintiff requested a hearing before an Administrative Law Judge (ALJ) on August 12, 2009.  (DE 10, pp. 80-81)  The plaintiff appeared before ALJ Ronald E. Miller on January 7, 2011 (DE 10, pp. 14-38).  The ALJ denied the plaintiff's applications for benefits on January 19, 2011.  (DE 10, pp. 39-53)

The plaintiff requested review of the ALJ's ruling by the SSA Appeals Council ("the Appeals Council") on January 27, 2011.  (DE 10, p. 12)  The Review Council denied the plaintiff's request for review on August 4, 2011, whereupon the ALJ's determination became the final ruling of the Commissioner.  (DE 10, pp. 1-5)

The plaintiff filed the instant action on September 22, 2011.  (DE 1)  The defendant filed his Answer and the Administrative Record (the Record) on January 10, 2012.  (DE 9-10) Thereafter, the plaintiff filed a Motion for Judgment on the Administrative Record ("the plaintiff's Motion" or "his Motion") on March 30, 2012, and the defendant filed a response in opposition on July 30, 2012.  (DE 13, 19)  This matter is now properly before the Court.

## II.  Review of the Record

### A.  Relevant Medical Evidence[1]

Doctor Michael T. Baker, M.D. treated the plaintiff on January 19, 2005 on referral from Dr. Cynthia Wallace, the plaintiff's primary care physician.  (DE 10, pp. 204-05)  Doctor Baker conducted a stress test on the plaintiff after the latter complained of "chest discomfort and shortness of breath."  (DE 10, p. 204)  Doctor Baker reported the results of the stress test as "normal," and unlikely to be of "cardiac etiology."  (DE 10, p. 204)

---

[1]  Although the plaintiff sought benefits based on claims of "heart failure, blood sugar, memory loss, and blood pressure problems," the plaintiff raises claims in his Motion based solely on his heart condition.  The plaintiff's other medical problems are discussed in the R&R only where necessary to ensure completeness.

The plaintiff's next heart-related event occurred approximately three and one-half (3½) years later when Dr. Everett Wray, M.D. recorded the following "[i]mpression[s]" following an echocardiogram performed on the plaintiff at the Sumner Regional Medical Center on July 16, 2008: "Dilated cardiomyopathy with severe left ventricular systolic dysfunction,"[2,3] "Bi[l]ateral enlargement,"[4] "Moderate pulmonary hypertension,"[5] and an estimated left ventricular ejection fraction (LVEF) of 20 %.[6]  (DE 10 pp. 213-14)

The plaintiff returned to the Sumner Regional Medical Center again on July 20, 2008 where Dr. Geoffrey D. Lifferth, M.D. treated the plaintiff for "shortness of breath," "chest pain," and "dyspnea on exertion."[7]  (DE 10, p. 208)  A chest X-ray "show[ed] cardiomegaly."[8]  (DE 10, p. 209) Doctor Lifferth's opinion was that the July 16, 2008 echocardiogram was "markedly abnormal." (DE 10, p. 209)  Doctor Lifferth's final diagnosis was "[a]cute dyspnea on exertion," and "[s]evere dilated cardiomyopathy."  (DE 10, p. 209)  Doctor Lifferth transferred the plaintiff to St. Thomas

---

[2]  "Dilated cardiomyopathy is a disease of the heart muscle, primarily affecting [the] heart's main pumping chamber (left ventricle).  The left ventricle becomes enlarged (dilated) and can't pump to [the] body with as much force as a healthy heart can."  *http://www.mayoclinic.com/health/dilated-cardiomyopathy/DS01029.*

[3]  "Ventricular systolic dysfunction is . . . a difficulty of the left ventricle to empty or eject the blood from its chamber.  It is defined in terms of left ventricular ejection fraction (LVEF) . . . ."  *http://www.geroeducation.org/ hypertext_module/heart_failure/html/Definition_of_Left_Ventricular_Systolic_Dysfunction.htm.*

[4]  "Bilateral" pertains to both sides.  *Dorland's Illustrated Medical Dictionary* 217 (31st ed. 2007).  "Bilateral enlargement" in the plaintiff's case means that both ventricles are enlarged.

[5]  "Pulmonary hypertension is a type of high blood pressure that affects the arteries in the lungs and the right side of the heart."  http://www.mayoclinic.com/health/pulmonary-hypertension/DS00430.

[6]  "Ejection fraction [EF] is a measurement of the percentage of blood leaving [the] heart each time it contracts."  *http://www.mayoclinic.com/health/ejection-fraction/AN00360.*  The normal ejection fraction is 55 to 70 %. *Id.*

[7]  "Dyspnea" is "breathlessness or shortness of breath; difficult or labored respiration."  *Dorland's at* 589.

[8]  "Cardeomegaly" is defined as an "[e]nlarged heart . . . seen on a chest X-ray before other tests are performed to diagnose the specific condition causing . . . cardiomegaly."  *http://mayoclinic.com/health/enlarged-heart/ds01129.*

Hospital (St. Thomas) that same day.  (DE 10, p. 209)

The plaintiff was hospitalized at St. Thomas from July 20 until July 25, 2009.  (DE 10, pp. 217-80)  Doctor Kimberly J. Brown, M.D. evaluated the plaintiff on June 20, 2008 when he was admitted.  (DE 10, pp. 220-23)  Doctor Brown's initial assessment was that the plaintiff had "[d]ilated cardiomyopathy with acute systolic exacerbation with dyspnea . . . ."[9]  (DE 10, p. 222)  Doctor Brown referred the plaintiff's case to Dr. Arthur E. Constantine, M.D." (DE 10, pp. 224-27), who concluded that the plaintiff had "[d]ilated cardiomyopathy" (DE 10, p. 226).  Doctor Constantine then referred the plaintiff's case to Dr. Douglas J. Pearce, M.D..  (DE 10, p. 226)

The plaintiff underwent a number of tests while he was at St. Thomas.  X-rays were taken on July 21, 2008 which revealed that the plaintiff's heart was "within normal limits and size," with the further conclusion that there were no "acute cardiopulmonary abnormalities."  (DE 10, pp. 227, 239)  The plaintiff underwent a repeat echocardiogram on July 23, 2008 which revealed a "severely dilated left ventricle with global hypokinesis,"[10] and an EF of 15-20 %.  (DE 10, pp. 218, 258-68)  The right ventricle was "mild to moderately enlarged as well."  (DE 10, p. 218).  On July 23, 2008, the plaintiff underwent a "left heart catheterization, coronary arteriography,[11] [and] left ventriculogram . . . ."[12]  (DE 10, pp. 218, 244-58)  The final impression stemming from these tests was "[s]evere cardiomyopathy . . . [e]levated left ventricular end diastolic pressure . . . ,"[13] and an

[9]  "Systolic" in the context of "cardiomyopathy" (heart failure) is "heart failure due to a defect in the expulsion of blood [from the heart] that is caused by an abnormality in systolic [pumping] function."  *http://medical-dictionary. thefreedictionary.com/systolic+heart+failure*.  In the context of Dr. Brown's diagnosis, this means that the plaintiff's heart failure is made worse – "exacerbat[ed]" – by a serious – "acute" – pumping problem with the heart.

[10]  "Hypokinesis" is defined as "abnormally decreased . . . function or activity."  *Dorland's* at 915.

[11]  "Coronary arteriography" is the imaging of the coronary arteries.  *Dorland's* at 145.

[12]  A "ventriculogram" is the imaging of the ventricles of the heart.  *Dorland's* at 2076.

[13]  "[D]istolic pressure" is the measure of the pressure in the arteries" when the heart muscle is resting between heartbeats.  *http://www.heart.org/HEARTORG/Conditions/HighBloodPressure/AboutHighBloodPressure/*

EF of approximately 10 %.  (DE 10, p. 257)  Finally, the plaintiff took a Dual-isotope Myocardial Perfusion Scan with Graded Exercise  (stress test) on July 24, 2008.  (DE 10, pp. 218, 239-40, 262-72)  The image revealed "severe global hypokinesis . . . ," and an EF of 22 %.  (DE 10, pp. 218, 240)

Doctor Pearce discharged the plaintiff from St. Thomas on July 25, 2008.  (DE 10, pp. 217-19)  In his "Final Note and Discharge Summary," Dr. Pearce's diagnosis was that the plaintiff had "[d]ilated cardiomyopathy, [a]cute systolic heart failure [and] valvular heart disease."  (DE 10, p. 217)  The plaintiff was given exercise and dietary instructions, and ordered to follow up with Dr. Pearce at the Heart Failure Clinic in two weeks.  (DE 10, p. 218)

The plaintiff returned to the Heart Failure Clinic on August 12, 2008.  (DE 10, pp. 296-99)  The plaintiff reported to Dr. Pearce that he was "feel[ing] much better" since his hospitalization, that he was "breathing much better," and that he was "able to climb 2 flights of steps . . . before he became dyspnic."  (DE 10, p. 296)  Although the plaintiff had not begun cardiac rehabilitation, he told Dr. Pearce that he would.  (DE 10, p. 296)  Doctor Pearce assigned the plaintiff a New York Heart Association (NYHA) Functional Classification[14] of II (NYHA II),[15] and told him not to return to work.  (DE 10, pp. 298-99)

The plaintiff saw Dr. Pearce next on November 24, 2008.  (DE 10, pp. 292-95)  The plaintiff told Dr. Pearce that he was "[b]reathing better," and that he "felt better" since decreasing his diuretic by half.  (DE 10, p. 292)  The plaintiff underwent Magnetic Resonance Imaging (MRI) that same day.  (DE 10, pp. 300-02)   The impression from the MRI was "[d]ilated nonischemic

Understanding-Blood-Pressure-Readings_UCM_301764_Article.jsp.

[14]  The NYHA Functional Classification system is a way "of classifying the extent of heart failure." http://en.wikipedia.org/wiki/New_York_Heart_Association_Functional_Classification.

[15]  Class II under the NYHA Functional Classification system pertains to "mild" heart failure where "physical activity is slightly limited as ordinary physical activity may cause fatigue or dyspnea." http://www.newyork heartassociation.com.

cardiomyopathy . . . ,"[16] and an LVEF of 43 %  (DE 10, p. 302)  Doctor Pearce noted that the plaintiff's condition was "[i]mproving," that he wanted to return to work, and instructed the plaintiff to return to the Heart Failure Clinic in six months.  (DE 10, pp. 294-95)

The plaintiff, having returned to job as a corrections officer (C/O), went back to the Heart Failure Clinic on January 7, 2009 complaining of "generalized fatigue, headaches . . . activity intolerance . . . palpitations, and dizziness with position change."  (DE 10, p. 288)  Dr. Pearce noted that the plaintiff's energy level was unchanged, he had no chest pain or dyspnea, that his palpitations were stable, and that his dizziness was relieved by taking his medications.  (DE 10, p. 289)  Doctor Pearce again diagnosed the plaintiff as having chronic systolic heart failure, but was unable to determine whether the plaintiff's condition was "[w]orsening."  (DE 10, p. 290)  Doctor Pearce classified the plaintiff as NYHA III(a),[17] noted that the plaintiff "really [was] unable to work," instructed him to "[t]ake his medications," and told him to return in two weeks.  (DE 10, p. 290)

The plaintiff returned to the Heart Failure Clinic on February 2, 2009.  (DE 10, pp. 284-87)  The plaintiff reported that, although he "[c]ontinue[d] to have occasional dizziness . . . . [it] [wa]s much improved with holding lasix."  (DE 10, p. 284)  Doctor Pearce again assigned the plaintiff an NYHA II functional classification, described the plaintiff's condition as "improving,"although still "unable to work," noted that the plaintiff "[f]orgets to take his meds on occasion inspite [*sic*] of pill box reminder," and told the plaintiff to return in three months.  (DE 10, p. 287)

On March 20, 2009, the plaintiff went to the emergency room (ER) at St. Thomas,

---

[16]  "[N]onischemic cardiomyopathy" is a form of cardiomyopathy that is not due to coronary artery disease (poor coronary artery blood supply)." *http://my.clevelandclinic.org/heart/disorders/heartfailure/cardiomyopathy.aspx*.

[17]  Class III under the NYHA classification system pertains to moderate heart failure where there is a "significant limitation of physical activity as even very light physical activity may cause fatigue or breathing difficulties." *http://www.newyorkheartassociation.com*.  There is no "dyspnea" at rest under NYHA III(a).  *Http://www.fpnotebook. com*.

complaining of "shortness of breath." (DE 10, pp. 306-13) The plaintiff had an electrocardiogram (EKG) and a chest X-ray. The EKG showed a sinus mechanism rate of 63, which is normal, and an anterior Q-wave that "appear[ed] to be old."[18] (DE 10, p. 307) The X-ray revealed "[b]orderline to mild cardiomegaly . . . [but] [n]o radiographic evidence for cardiopulmonary disease." (DE 10, p. 308) The ER physician noted that he "really d[id] not think [the plaintiff had] any evidence of CHF . . . [or] acute coronary syndrome," and that the "[c]hest pain, shortness of breath . . . [had been] resolved." (DE 10, p. 307) The ER physician noted further that he suspected gastroesophageal reflux disease (GERD). (DE 10, p. 307)

The plaintiff underwent a Multigated Acquisition Scan (MUGA)[19] on August 4, 2009. (DE 10, pp. 372, 382, 384, 390, 394) Although the actual record of the scan does not appear to be in the Record, Dr. Pearce noted that the MUGA scan showed an LVEF of .35 to .40 %,[20] a dilated left ventricle, and global hypokinesis. (DE 10, pp. 372, 382, 384, 390, 394)

The plaintiff returned to the Heart Failure Clinic on September 28, 2009. (DE 10, pp. 376-83) Doctor Pearce noted that, although the plaintiff reported "increased fatigue and somnolence,"[21] the plaintiff was unsure whether if it was because of his medications. (DE 10, p. 376) Doctor Pearce noted further that the plaintiff had "no hospital admissions or ED [emergency department] visits" since his last appointment. (DE 10, p. 376) Doctor Pearce again diagnosed the plaintiff with "chronic" "[s]ystolic heart failure." (DE 10, p. 383) Characterizing the plaintiff's heart condition

---

[18] An EKG measures the rhythm of the heart. *Dorland's* at 606. The normal rate is between 60-100 beats per minute. *http://fitsweb.uchc.edu/student/selectives/HeartStoppers/RHYTHM.HTM.* The presence of the anterior Q-Wave suggests the permanent death of part of the heart muscle. *https://www.healthtap.com/#topics/anterior-q-wave.*

[19] A MUGA scan "is a noninvasive diagnostic test used to evaluate the pumping function of the ventricles (lower chambers of the heart)." *http://my.clevelandclinic.org/heart/services/tests/nuclear/muga.aspx.*

[20] The ejection fraction varies in the medical/clinical records from .30 to .40 % to .35 to .40 %.

[21] "Somnolence" is defined as excessive "drowsiness or sleepiness . . . ." *Dorland's* at 1760.

as "stable," Dr. Pearce classified the plaintiff NYHA III(a), opined again that the plaintiff was "unable to work," and instructed the plaintiff to return in six months. (DE 10, p. 383)

The plaintiff followed up with Dr. Pearce again on March 2, 2010. (DE 10, pp. 372-75) The plaintiff had an echocardiogram that same day. (DE 10, pp. 370-71) The echocardiogram showed an EF of 45 % (DE 10, p. 370); however, Dr. Pearce reported it as 40 % (DE 10, p. 375). Doctor Pearce opined that the plaintiff still was unable to work, and that he remained NYHA III(a). (DE 10, p. 375) Doctor Pearce noted further that the plaintiff's heart condition was "[s]table," and that he did not need to return for another six (6) months.[22] (DE 10, p. 375)

Finally, the plaintiff saw Dr. Pearce on August 31, 2010. (DE 10, pp. 384-89) From a cardiac perspective, the plaintiff told Dr. Pearce that "he is about the same with no new complaints . . . [ and that] [p]oor energy level remain[ed] his chief complaint." (DE 10, p. 384) Doctor Pearce characterized the plaintiff's condition as "stable," classified him NYHA III(a), opined again that the plaintiff was "unable to work," and told him to return for six (6) months. (DE 10, p. 387)

## B. Testimonial Evidence

### 1. Plaintiff's Testimony

The plaintiff was represented at the January 7, 2011 hearing before the ALJ by attorney Kaludis. (DE 10, p. 16) The plaintiff testified on direct examination by the ALJ that he was twenty-five years of age at the time of the hearing, that he had graduated from high school, and that he had finished one and one-half years of college. (DE 10, pp. 17-18) He also testified that heart problems and diabetes ran in his family, and that he neither smoked nor drank alcohol. (DE 10, p. 18)

---

[22] Doctor Pearce noted following his August 31st meeting with the plaintiff that he "had an extensive and frustrating discussion about . . . [the plaintiff's] unwilling[ness] to do what is necessary from a lifestyle standpoint to get his sugar under control" (DE 10, p. 375) None of the issues raised in this action pertain to the plaintiff's diabetes. However, in light of other comments made by Dr. Pearce regarding the plaintiff's willingness to follow orders, this statement nevertheless is germane to the issues before the Court.

The plaintiff testified that he was last employed as a C/O with the Sumner County Sheriff's Department, but quit his job when he began to experience "heart failure." (DE 10, pp. 27-28) The plaintiff told that ALJ that he returned to work as a C/O for one and one-half months after the disability onset date of July 20, 2008, but quit his job again because working as a C/O caused him to suffer from "general soreness" and made him feel "wor[n] out." (DE 10, p. 21) The plaintiff told the ALJ that he was not looking for work. (DE 10, p. 20)

The plaintiff testified that he was not receiving worker's compensation, or either short-term or long-term disability benefits. (DE 10, p. 21) He testified that he was supporting himself with the proceeds from a "homeowner's insurance" policy that paid him if he "got hurt or injured," that the policy paid him an unspecified amount each month, and that as of January 30, 2013 he had "about . . . half a year" of benefits remaining. (DE 10, p. 21) The plaintiff testified that he did not use the proceeds of the insurance policy to pay his mortgage payment, that he used it instead to pay for a car, and that the bank had repossessed his house for non payment. (DE 10, pp. 21-22) He also testified that the proceeds from the insurance policy "pretty much" helped him make financial ends meet, but that his parents helped him out "[a] little, every now and again . . . ." (DE 10, p. 22)

The ALJ asked the plaintiff "[w]hat kind of exercise do you [do] each day," to which the plaintiff replied, "[N]one." (DE 10, p. 22)

The ALJ interrupted his direct examination of the plaintiff at this juncture, and asked attorney Kaludis if had "any medical source statements that [he] wanted [the ALJ] to consider," to which attorney Kaludis replied, none "[o]ther than what I told you about earlier . . . . " (DE 10, p. 23) Attorney Kaludis also told the ALJ that he had no documentation that showed the plaintiff could not sit or walk.[23] (DE 10, p. 23)

_____

[23] The ALJ's actual statement was: "[Y]ou don't have anything that says he **can** sit and walk . . . ." (DE 10, p. 23)(emphasis added) The undersigned construes the ALJ to have meant that Attorney Kaludis had no documentation

When direct examination resumed, the plaintiff testified that the "number one problem that ke[pt] [him] from working" was his cardiomyopathy. (DE 10, p. 23) The plaintiff testified that Dr. Pearce at St. Thomas Hospital was his heart doctor, and that he took Coreg, Digoxin, and Spironolactone for his cardiomyopathy. (DE 10, p. 24) The plaintiff testified that he saw Dr. Pearce "[a]bout every six months," and that Dr. Pearce was unhappy that the plaintiff was not following his order to exercise. (DE 10, p. 25)

The ALJ turned his attention next to the plaintiff's diabetes. (DE 10, pp. 25-27) The plaintiff testified that he "got" diabetes when he had heart failure and stopped working, that his diabetes was under control "for the most part," and that neither his diabetes nor his asthma "cause[d] any problems with . . . finding work." (DE 10, p. 25) The ALJ raised the issue of exercise again in the context of the plaintiff's diabetes, in response to which the plaintiff replied that there was no place to walk where he lived. (DE 10, p. 26)

Addressing the plaintiff's asthma next, the ALJ asked the plaintiff if his asthma caused him any "vocational problems," to which the plaintiff replied, "not unless [he] g[ot] bronchitis, or something like that."[24] (DE 10, pp. 28-29)

Following the AJL's initial questioning, Attorney Kaludis asked the plaintiff to describe a "typical day" to the ALJ. (DE 10, p. 29) The plaintiff replied as follows:

> On a typical day, I stay up late until about one or two in the morning, sometimes I'll wake up at 11 in the morning, or sometimes three in the afternoon. From then, I'll read, play video games, watch TV. I'll take my dog out, I have a German Shepherd. I'll play with her, throw the Frisbee for her for about 15 minutes. Snack a little bit here and there. And take my medicine, if I remember to take it. And that's about it. Most of the time, I'll get tired out and sit down and rest for

---

to show that the plaintiff **could not** sit or walk. The undersigned's opinion is supported by the Record, *i.e.*, there is nothing in the Record that shows the plaintiff cannot sit or walk.

[24] None of the claims raised on appeal pertain to the plaintiff's asthma problems.

a while.  On other days where I go with my parents to go shopping or, you know, walk around Opryland Hotel, and by the time we get back I'm just really tired and want to go to sleep.  It kind of wears me out, to be going –

(DE 10, pp. 29-30)

When the ALJ resumed his questioning, the plaintiff testified that he owned a car and that he drove.  (DE 10, p. 30)  The ALJ observed that it might "take . . . three hours to walk around Opryland Hotel."  (DE 10, p. 30)  The plaintiff admitted that he "w[as] walking for a good while."  (DE 10, p. 31)  The plaintiff also admitted that there was nothing to keep him from driving to "a Walmart parking lot, or to Rivergate . . . [to] walk[] around the mall."  (DE 10, p. 31)

Attorney Kaludis asked the plaintiff on cross-examination to tell the ALJ if he had any side effects from the medicine he took.  (DE 10, p. 31)  The plaintiff testified, "[n]ot that [he] notice[d]" but, "in the beginning," he would get "dizzy" and become "forgetful."  (DE 10, p. 31)  The plaintiff also said that he "still g[o]t dizzy every now and again, just sitting still."  (DE 10, p. 31)

### b.  Vocational Expert's Testimony

The ALJ called Dr. Gary Sturgill, Ph.D. to testify as a vocational expert (VE).  (DE 10, p. 32)  After testifying that one and one-half months would have been insufficient time to "learn the job" of C/O, the VE testified that the plaintiff's last substantial gainful activity (SGA) would have been as a "poultry eviscerator" between 2006 and 2008.  (DE 10, pp. 33-34)  The ALJ then presented the VE the following residual functional capacity (RFC) hypothetical:

> [C]onsider [a] hypothetical candidate for employment, same age, education, and work experience as Mr. Bozarth.  This hypothetical individual would be able to lift and carry 20 pounds occasionally, 10 pounds frequently.  Would be able to walk and stand for about four hours out of the day.  He would be able to sit for about six hours out of the day.  There would be an only occasional exposure to marked changes in temperature and humidity, and only occasional exposure to dust, fumes, and gases. . . .

(DE 10, pp. 34-35)  The VE provided the following testimony pertaining to the hypothetical presented to him.

> 1) The plaintiff would be unable to perform past relevant work as a poultry eviscerator because of the 4-hour limitation on walking and standing.  (DE 10, p. 35)
>
> 2) Taking the four-hour walking-standing restriction into consideration, the plaintiff, with his education, could perform light unskilled work as an office clerk, with approximately 2,900 positions in the state economy and 175,000 in the national economy, an interviewer with approximately 2,300 positions in the state economy and 117,000 in the national economy, or as a counter clerk with approximately 1,100 in the state economy and 59,000 in the national economy.  (DE 10, pp. 35-36)
>
> 3) Office clerk, interviewer, and counter clerk positions also are found at the sedentary level.  (DE 10, p. 36)

The ALJ then asked the VE to consider a RFC with the same environmental limitations, but that required the hypothetical candidate to  lift and carry ten (10) pounds maximum, sit for eight (8) hours during the work day, and stand and walk about two (2) hours a day.  (DE 10, p. 36)  Doctor Sturgill testified that there would be about a twenty (20) percent reduction in the jobs noted above, but that eighty (80) percent of those jobs still would be available.  (DE 10, p. 36)  When the ALJ asked if the hypothetical individual had, "due to severe cardiomyopathy," "insufficient stamina to work a full eight hour[] . . day, either sitting, standing, or walking, or a combination thereof, on a regular and continuing basis," the VE testified that none of the noted above would be available.  (DE 10, p. 37)

## III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the Record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the Record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Key*, 109 F.3d at 273.

### B. Administrative Proceedings Below

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.

Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then he is deemed disabled.

Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work, in which case the claimant is not disabled.

Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir.2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step can be met by relying on the medical-vocational guidelines, known the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 312 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.*, *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

(S.S.A.)); *see also Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining the RFC for purpose of the analysis at steps four and five, the SSA is required to

consider the combined effect of all the claimant's impairments, mental and physical, exertional and

nonexertional, severe and nonsevere.  42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853

F.2d 483, 490 (6th Cir. 1988).

## 2. Notice of Decision

The ALJ denied the plaintiff's applications for benefits on January 19, 2011, setting forth

in his Notice of Decision ("the ALJ's Decision" or "his Decision") the findings of fact and

conclusions of law enumerated below.

1.   The claimant meets the insured status requirements of the Act through September 30, 2011.  (DE 10, p. 44)

2.   The claimant has not engaged in SGA since July 20, 2008, the alleged disability onset date.  (DE 10, p. 44)

3.   The claimant has the following severe impairments: cardiomyopathie and asthma.  (DE 10, pp. 44-46)

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (DE 10, p. 46)

5.   The claimant has the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking about 4 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; having only occasional exposure to marked changes in temperature and humidity; and having only occasional exposure to dust, fumes, and gases.  (DE 10, pp. 46-51)

6.   The claimant is unable to perform any past relevant work. (DE 10, p. 51)

7.   The claimant was born on January 1, 1986, and was 22 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (DE 10, p. 51)

8.   The claimant has at least a high school education and is able to communicate in English.  (DE 10, p. 52)

9.   Transferability of job skills is not an issue in because the claimant's past relevant work is unskilled.  (DE 10, p. 52)

10.  Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform, *i.e.*, office clerk, interviewer, counter clerk.  (DE 10, pp. 52-53)

11.  The claimant has not been under a disability as defined by the Act through the date of the ALJ's Decision.  (DE 10, p. 53)

The ALJ also made the following specific determinations with respect to the plaintiff's applications for benefits:

1.   Based on the application for a period of disability and disability insurance benefits filed on January 7, 2009, the claimant is not disabled under sections 216(i) and 223(d) of the Act.  (DE 10, p. 53)

2.   Based on the application for supplemental security income filed on January 7, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Act.  (DE 10, p. 53)

### IV.  Claims of Error

#### A.  Whether the Evidence Supports the
#### ALJ's RFC Determination
#### (DE 13, pp. 6-10)

The plaintiff argues that the ALJ's RFC assessment was not supported by substantial evidence.  This claim comprises the following three specific arguments: 1) the ALJ failed to give the proper weight to Dr. Pearce's subjective opinion that the plaintiff was unable to work; 2) the ALJ failed to evaluate Dr. Pearce's classification of the plaintiff under the NYHA Functional

Classification System; and 3) the ALJ's RFC assessment was not supported by substantial evidence. (DE 13, pp. 6-10)

## 1. Dr. Pearce's Subjective Opinion

The crux of the plaintiff's first argument appears to be that Dr. Pearce was a "treating source" within the meaning of the Act and, as such, his medical/clinical weight was entitled to deference. A "treating source" is defined, in relevant part, as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s) . . . .

20 CFR §§ 404.1502, 416.902.

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)(quoting 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating source's opinion "controlling weight," he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportabilty of the opinion, consistency of the opinion with the Record as a whole, and specialization of the treating source." *Cole* 661 F.3d at 937 (quoting *Wilson*, 378 F.3d at 544)(citing 20 C.F.R. § 404.1527(d)(2)). The ALJ has the duty to "give good reasons in [the] notice of determination or decision for the weight . . . give[en] [a] treating source's opinion." *Cole* 661 F.3d

at 937 (citing 20 C.F.R. § 404.1527(d)(2)). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting S.S.R. 96–2p, 1996 WL 374188 (July 2, 1996)).

The Record shows that Dr. Pearce first treated the plaintiff on July 20, 2008 (DE 10, pp. 217-75), and that he treated the plaintiff for heart failure through March 2, 2010 (DE 10, pp. 372-75). Dr. Pearce is a "treating source" under the definition above and, as such, the ALJ was required to give his medical/clinical opinions "controlling weight" unless there were good reasons not to.

Although not entirely clear from his Motion, the essence of the plaintiff's first argument appears to lie in the following statement made by the plaintiff in his Motion:

> While the ALJ did ask the Vocational Expert about [the plaintiff's] fatigue, he failed to provide good reasons for rejecting Dr. Pearce's assessment. **If the ALJ believed Dr. Pearce's assessment, then [the plaintiff] would be disabled.**

(DE 13, p. 9)(internal citations omitted)(emphasis added)   The plaintiff then quotes the following excerpt from the ALJ's Decision immediately following the statement quoted above:

> While the claimant's cardiologist, Dr. Pearce, has made statements in **his treatment records indicating that the claimant should not or could not go back to work, this is a conclusory opinion on a non-medical issue that is reserved to the Commissioner**. A medical expert is not familiar with the demands of the many jobs existing in the national economy and is not qualified to offer an opinion as to whether the claimant can work in any capacity. **Consequently, the undersigned does not give significant weight to Dr. Pearce's statements in the treatment records**.

(DE 13, p. 9)(emphasis added)   Taken together, the plaintiff's argument appears to be that, in determining the plaintiff was not disabled, the ALJ failed to give the "controlling" weight to Dr. Pearce's subjective opinion that he was.

The ALJ did not err in his decision not to "give significant weight to Dr. Pearce's

statements" that the plaintiff "should not or could not go back to work."  The question of disability, and a claimant's ability to work,  is a decision "reserved to the Commissioner," who has exclusive authority in determining the question of "disability" – not the treating physician.  20 C.F.R. § 404.1527(d)(1).  This argument is without merit.

## 2. The Plaintiff's Classification Under the NYHA Functional Classification System

The plaintiff appears to make two separate arguments within the context of his broader second argument that the ALJ "failed to evaluate Dr. Pearce's NYHA Classification for [the plaintiff]."  (DE 13, pp. 8-9)  The plaintiff seems to argue first that the ALJ did not take into account that his heart condition causes him to fatigue easily (DE 13, pp. 8-9), and second, that the ALJ did not address the effects of the medications that he takes.  (DE 13, p. 10)

### a. Fatigue

The Record shows that the ALJ addressed the plaintiff's NYHA classification in detail in his lengthy analysis of the plaintiff's medical history, and Dr. Pearce's medical/clinical opinion that exertion causes the plaintiff to become fatigued.  (DE 10, pp. 48-49)  Notwithstanding the plaintiff's argument to the contrary, it may be inferred from the statement below that the ALJ actually accepted Dr. Pearce's medical/clinical opinions.

> In sum, **the above residual functional capacity assessment is supported by** the claimant's partially credible statements, **the treatment records**, and the medical opinion provided by Dr. Fletcher.

(DE 10, p. 51)(emphasis added)  A plain reading of the statement above supports that conclusion that the ALJ did not render his own medical opinion, or substitute his own diagnosis for Dr. Pearce's.  Rather, apart from discounting Dr. Pearce's subjective opinion that the plaintiff was unable to work, discussed *supra* at pp. 17-19, the ALJ gave Dr. Pearce's medical/clinical opinions

full weight.  Moreover, the plaintiff does not argue, nor can such argument be construed from the Record, that there was anything other than Dr. Pearce's subjective opinion that constituted error on the ALJ's part.  This argument is without merit.

### b. Medication Side Effects

The plaintiff argues next that the ALJ "did not consider any of the medication that w[ere] being prescribed" for his condition(s).  (DE 13, p. 10)  Coreg is the only medication that the plaintiff mentions specifically in his Motion in the context of fatigue.  (DE 13, p. 10)

According to the plaintiff, "[o]ne of the less serious side effects of Coreg is feeling weak or tired," which the plaintiff asserts that he "complained about at the hearing (Tr. 26-27)."  (DE 13, p. 10)  The plaintiff testified as follows when his attorney asked him whether his medications had any side effects:

> A  **None that I notice**, but I know in the beginning when Alasics[25] [phonetic] was up real high, I'd get dizzy. I still get dizzy every now and again, just sitting still. Other than that, I can't recall anything.  I know there's probably a little bit more than that, but I just can't remember.  What I notice most is the dizziness, and forgetfulness.  **I don't know if that's caused by the medicine**, or not, but I think it might be a contributing factor.

---

[25] "Alasics," spelled phonetically, appears to refer to Lasix which the plaintiff was taking.

(DE 10, p. 31)(emphasis added)[26]  A plain reading of the plaintiff's testimony above shows that he made no mention of Coreg at the hearing.  He also made no mention that any of his medications – individually or in combination – made him "feel[] weak [and] tired."  He testified at the hearing only about dizziness.  The plaintiff's statement that he "complained" at the hearing about Coreg making him "feel[] weak and tired" is, therefore, factually incorrect.

As to the plaintiff's testimony about his dizziness, the ALJ addressed that as follows: "The claimant testified that he does not notice any side effects from his medications except occasional dizziness and forgetfulness when his Lasix intake is too high."  (DE 10, p. 47)  The ALJ's conclusion is supported by the plaintiff's own testimony.  It also is supported by Heart Failure Clinic medical/clinical records.  On November 11, 2008 the plaintiff told Dr. Pearce that he "felt much better" since "decreas[ing] [his] diuretic by half." (DE 10, p. 292)  On February 2, 2009, Dr. Pearce noted that the plaintiff "[c]ontinues to have occasional dizziness but reports [but that it] is much improved with holding lasix." (DE 10, p. 284)  In other words, to the extent that Lasix caused the plaintiff to be dizzy, the dizziness had been controlled by reducing the Lasix dosage.

As far as the actual issue of "fatigue," the Record shows that the ALJ did not address the plaintiff's fatigue in the context of his medications. Although the medical/clinical records contain numerous references to the plaintiff being fatigued (DE 10, pp. 220, 224, 288, 372, 376), the plaintiff does not cite to any medical/clinical records where "fatigue" is linked to his prescription medications, nor has the undersigned been able to find any documentary evidence in the Record that establishes such a link.  The only place in the Record where "fatigue" and "medications" are

---

[26]  There is nothing on pages 26 or 27 in the transcript of the proceedings that pertains to the effects of the plaintiff's medications.  The testimony quoted above is the only testimony that pertains to the side effects of the plaintiff's medication.  Thus, the undersigned concludes that this is the testimony to which the Plaintiff is referring.

addressed together is on September 28, 2009 when the plaintiff told Dr. Pearce that he has had "increased fatigue and somnolence . . . [but] . . . [wa]s unsure if it [wa]s related to [his] med[ications]." (DE 10, p. 376) This statement in Dr. Pearce's September 28 medical/clinical report tracks with the plaintiff's testimony at the hearing that he "did not know if [his fatigue was] caused by the medicine."

Finally, that the plaintiff was unable to establish that his fatigue was caused by his medications is supported by the fact that the plaintiff claimed to be fatigued when he was admitted to St. Thomas on July 20, 2008. (DE 10, pp. 220-21, 224) The Record shows, however, that the plaintiff had not been prescribed Coreg, or any other medication for that matter, prior to being admitted to St. Thomas. (DE 10, pp. 221, 225S) The Record shows that the only medication the plaintiff was using prior to being admitted to St. Thomas was an Albuterol Inhaler,[27] and he used that only "occasionally." (DE 10, pp. 208, 217, 221, 225) Given the fact that the plaintiff reported being fatigued before any medications were prescribed, substantial evidence existed in the Record for the ALJ to have concluded that there was no evidence that the plaintiff's medications caused his fatigue had the ALJ actually addressed the issue.

For the reasons explained above, the plaintiff's arguments that the ALJ failed to consider his NYHA classification are without merit.

---

[27] "An albuterol inhaler is a quick-relief or rescue medication used to decrease asthma symptoms." *http://asthma.about.com/od/treatmentoptions/a/tx_medguide_albuterol.htm.*

### 3. The ALJ's RFC Determination

The final argument in the context of this claim is that the ALJ's RFC determination was not supported by "substantial evidence." As previously noted, *supra* at p. 15, the ALJ determined that the plaintiff had the RFC to perform light work. The Act defines "light work" is as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. **If someone can do light work, we determine that he or she can also do sedentary work,**[28] **unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.**

20 C.F.R. §§ 404.1567(b), 416.967(b).

The history of Dr. Pearce's classification of the plaintiff under the NYHA Functional Classification system is as follows: August 12, 2008 – Class II (DE 10, p. 298); November 24, 2008 – Class II (DE 10, p. 294); January 7, 2009 – Class IIIa (DE 10, p. 290); February 2, 2009 – Class II (DE 10, p. 287); September 28, 2009 – Class IIIa (DE 10, p. 383); March 2, 2010 – Class IIIa (DE 10, pp. 375, 393); August 31, 2010 – Class III(a) (DE 10, p. 387). The physical limitations under NYHA II and III(a) are defined *supra* at pp. 5-6, nn. 15, 17. As previously established, the former pertaining to mild heart failure where physical activity is slightly limited, and the latter to moderate heart failure where physical activity is significantly limited.

---

[28] The Act defines "sedentary work" as follows under 20 C.F.R. §§ 404.967(a), 404.1567(a):

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

In addition to Dr. Pearce's NYHA classifications, the ALJ had before him the information that the plaintiff provided in the fatigue and pain questionnaires that he completed. The plaintiff stated in those questionnaires that he made his own breakfast and lunch; helped with his own shopping; did his own laundry; helped with vacuuming; helped with the dishes; took out the trash; read, watched television and movies, played video games; tried to go outside every day; went somewhere with his parents two or three times a week; walked when he was at home; drove his own car; attended sporting events, went to movies, and "sometimes" went out of town with his parents. (DE 10, pp. 156-57, 159)

Of course, the testimony at the hearing also was before the ALJ. As previously noted, *supra* at pp. 9-10, attorney Kaludis told the ALJ that he had no documentation that the plaintiff was unable to walk or sit. Attorney Kaludis also admitted to the ALJ that, apart from Dr. Pearce's NYHA classifications, he did not have any actual medical source statement from a nurse, nurse practitioner, physician's assistant, or physician that established what the plaintiff could, or could not, do. (DE 10, p. 23)

Also before the ALJ was the plaintiff's testimony when attorney Kaludis instructed the plaintiff to "Tell the judge briefly what you do [on] a typical day," to which the plaintiff testified as previously noted, *supra* at pp. 10-11. The following related testimony was adduced immediately thereafter upon reexamination of the plaintiff by the ALJ:

Q    You drive?

A    Yes, I do drive.

Q    Do you have a car?

A    Yes, sir.

Q    And what was that about Opryland Hotel

| | |
|---|---|
| A | Sometimes we went to like, one day we went to Opryland Hotel, and we went to, what's that place called, Old Time Pottery, in Rivergate. My older sister got a Christmas tree for her and her husband. |
| Q | Okay, well I just wondered, that's a big area, a big flat surface for walking. |
| A | Mm-mnn. |
| Q | And that place, it'd take you three hours to walk around Opryland Hotel. |
| A | We were walking for a good while. |

(DE 10, pp. 30-31)

The ALJ also had available to him the report of Dr. Christopher W. Fletcher, M.D., a state-agency consulting physician. (DE 10, pp. 61-63, 314-22) Doctor Fletcher reviewed the plaintiff's medical records on April 16, 2009, and provided the following RFC assessment and medical conclusions: limited to lifting and/or carrying twenty (20) lbs. occasionally, ten (10) pounds frequently; standing and/or walking at least two (2) hours in an 8-hour workday; sitting about six (6) hours in an 8-hour workday, unlimited pushing and/or pulling; no postural limitations; no manipulative limitations; no visual limitations; no communicative limitations; avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation. (DE 10, pp. 314-319) Doctor Fletcher noted further that the plaintiff's claims were only "partly credible," that he had shown "significant improvement since the original diagnosis," and that his condition "did not prohibit all work." (DE 10, pp. 321))(unnecessary capitalization omitted) Doctor Joe G.

Gallison, M.D., a second state-agency medical consultant, also reviewed the plaintiff's medical records, and affirmed Dr. Fletcher's earlier opinion "as written." (DE 10, p. 367)

As an initial matter, the undersigned notes that there is no case law, binding or otherwise, that equates the NYHA II and IIIa classifications to "light" and "sedentary" work as those terms are used in the Act. Although it is tempting to conclude based on the similarity of their definitions that NYHA II equates to light work, and NYHA IIIa equates to sedentary work, the ALJ probably erred in not calling upon exert testimony to clarify the point. That said, however, for the reasons explained below, such error should be viewed as harmless under the facts of this case.

The documentary and testimonial evidence before the ALJ establishes that, with some limitations, the plaintiff leads a reasonably full life. In fact, staying up late every night, staying in bed until 11:00 a.m. or 3:00 p.m., reading, playing video games, watching television, playing with the dog, walking around the Opryland Hotel, going to sporting events and movies, and traveling might be viewed by some as a reasonably unrestricted lifestyle. More to the point, the nature of the plaintiff's admitted lifestyle, the household chores that he admits doing, as well as the reports of Drs. Fletcher and Gallison, constitute "substantial evidence" that the plaintiff has the RFC to perform light work or, at the very least, sedentary work. In either case, the result is the same – the plaintiff is not "disabled" under the Act. Thus, the plaintiff's third argument also is without merit.

For the reasons explained above, the plaintiff's first claim for relief is without merit.

**B. Whether the ALJ Erred in Using the Plaintiff's Failure**
**to Follow Prescribed Treatment as a**
**Basis for Denying His Claim.**
**(DE 13, ¶ IV.B, pp.10-12)**

The plaintiff argues that the ALJ erred in using the plaintiff's failure to follow prescribed

treatment to deny his claim, *i.e.*, that the ALJ did not follow the provisions of SSR 82-59.[29] (DE 13, pp. 10-11)

The "purpose" of SSR 82-59 is to "state the policy and describe the criteria . . . for a finding of failure to follow prescribed treatment when evaluating disability" claims under the Act. The "policy" under SSR 82-59 is as follows:

> An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such "failure" be found to be under a disability .
> . . .

In other words, under SSR 82-59, if the ALJ had found that the plaintiff <u>was</u> "disabled," then the ALJ had the authority to deny "disability" to the plaintiff on grounds that he refused to follow Dr. Pearce's prescribed treatment – but only where specific conditions exist, and with respect to which the ALJ makes the specific determination "whether or not failure to follow prescribed treatment is justifiable."

A precondition to the applicability of SSR 82-59 is that the ALJ determine the plaintiff was disabled. The ALJ did not determine that the plaintiff was disabled. Therefore, SSR 82-59 is inapposite to the facts of this case. Accordingly, the plaintiff's second claim for relief is without merit.

---

[29] The plaintiff through counsel also asserts that this claim of error is based on "U.S.C. § 405(g) sentence 4." (DE 13, p. 10) The fourth sentence in § 405(g) reads as follows:

> "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

The plaintiff does not explain how the ALJ's error is attributable to the sentence in question.

## C.  Whether the ALJ Erred in Mentioning That There Was No
### Objective Medical Evidence of Congestive Heart
### Failure or Any Acute Coronary Syndrome
### (DE 13, ¶ IV.C, pp. 12-14)

The plaintiff argues that the ALJ erred when he stated in his decision that, "[b]y March 2009, there was no objective medical evidence of congestive heart failure [CHF] or any acute coronary syndrome . . . ."  (DE 13, p. 12)  The specific sentence in the Decision to which the plaintiff appears to object reads as follows: "By March 2009, there was no objective medical evidence of congestive heart failure or any acute coronary syndrome . . . ."[30]  (DE 10, p. 50)

The plaintiff argues first that he has "non ischemic cardiomyopathy [*sic*] which is not congestive heart failure or acute coronary syndrome," and second, that he "has never suffered from an enlarged heart . . . ."  (DE 13, pp. 13-14)  The gist of the plaintiff's first two arguments appears to be that, since he never had CHF or an enlarged heart in the first place, the absence of those conditions noted in the X-ray on March 20, 2009 could not be used as a basis for concluding that his health had improved.  In a third argument, the plaintiff asserts that the ALJ erred in relying on an X-ray in reaching his conclusion. (DE 13, p. 13)

As shown below, there is ample evidence in the Record wherein the plaintiff either characterizes himself as a "CHF" patient, or the medical/clinical records characterize him as such.

1.  On July 20, 2008, Dr. Pearce's "[p]reoperative evaluation" was that the plaintiff had "Cardiomyopathy.  CHF."  (DE 10, p. 227)

2.  "CHF" was listed as "Diagnostic/Clinical data" in the

---

[30]  In reaching the conclusion at issue, the ALJ referred to an X-ray taken in the St. Thomas emergency room on March 20, 2009, in which the treating physician noted that he did not think the plaintiff "he ha[d] any evidence of CHF," or that the plaintiff's complaint "represent[ed] acute coronary syndrome."  (DE 10, p. 307)  Neither the ALJ nor the ER physician make mention an "enlarged heart."  Therefore, it appears that the plaintiff is using – incorrectly –  the expression "enlarged heart" in describing "acute coronary syndrome" to which both the ALJ and the emergency room physician do refer.  "Acute coronary syndrome [actually] is a term used for any condition brought on by sudden, reduced blood flow to the heart."  *http://www.mayoclinic.com/health/acute-coronary-syndrome/DS01061.*

plaintiff's July 24, 2008 "Graded Exercise Report." (DE 10, p. 269)

3. On July 31, 2008, the plaintiff went to CareHere in Brentwood because of pressure in his abdomen and kidneys. He reported to the staff that he was "feeling much better since his treatment in the hospital last week for CHF." (DE 10, p. 277)

4. The reports on Blood Chemistry and Cardiac Enzymes and Troponins studies conducted on January 7, 2009 characterize the plaintiff as a "CHF" patient. (DE 10, p. 303)

5. In his handwritten Disability Report – Appeal, Form SSA-3441, completed August 12, 2009, the plaintiff states that he "still h[as] congestive heart failure," that Dr. Pearce "treats [him] for CHF," and that Dr Pearce "monitor[s] [his] CHF and prescribes medicine." (DE 10, pp. 190-91)

6. In the same Form SSA-3441, the plaintiff lists the following medications that he takes for "CHF": Digoxin, Coreg, and Spironolactone. (DE 10, p. 193)

7. In the same Form SSA-3441, the plaintiff states "I still have CHF. Still in bad shape." (DE 10, p. 195)

8. The report on an echocardiogram performed on March 2, 2010 diagnoses the plaintiff's problem as "CHF." (DE 10, p. 388)

The Stanford University Hospital defines "congestive heart failure" and "cardiomyopathy"

as follows:

Heart failure, also called congestive heart failure, is a condition in which the heart can't pump enough oxygenated blood to meet the needs of the body's organs. The heart keeps pumping, but not effectively. . . . Cardiomyopathy is a more specific term for any disease of the heart muscle in which the heart loses its ability to pump blood effectively. . . . The term "cardiomyopathy" refers to the weak condition of the heart, while heart failure refers to the symptoms resulting from that weakness of the heart. **These terms are often used interchangeably, but both describe abnormal heart**

**function**. *Stanfordhospital.org/clinicsmedServices/COE/heart/DiseasesConditions/heartfailure/services/heartfailure_cardiomyopathy.html*.  As shown above, the ALJ did not err in referring to the plaintiff as having CHF where the plaintiff, as well as the medical/clinical records, refer to him as having CHF, and where those in the medical profession use the terms "CHF" and "cardiomyopathy" interchangeably.  This part of the plaintiff's argument is without merit.

There is evidence in the Record that the plaintiff also had an "enlarged" heart.  For example, in the CareHere treatment record dated July 18, 2008, the results of the echocardiogram made that same day characterize the plaintiff's heart as exhibiting "bilateral enlargement."  (DE 10, p. 278)  Five days later, in his discharge summary, Dr. Pearce noted that the plaintiff's "right ventricle was mild[ly] to moderately enlarged . . . ."  (DE 10, p. 218)  Seven months after that, on February 25, 2009, the plaintiff wrote the following when completing the Disability Report – Adult – Form SSA-3368:

> I was having trouble at work so I went to the doctor and he told me that I should not work due to my heart failure on 07/20/08.  **My heart was enlarged to 4 times** it's [*sic*] size and I have two valves that leak. . . .

(DE 10, p. 134)(emphasis added)

According to the Mayo Clinic, cardiomyopathy may cause the heart to become enlarged. The Mayo Clinic describes the relationship between the two as follows: "Cardiomyopathy is the thickening and stiffening of heart muscle. . . .  As the condition worsens, [the] heart may enlarge to try to pump more blood to [the] body."  *http://www.MayoClinic.com/health/enlarged-heart/ds01129/dsection=causes*.  Because there is evidence in the Record that the plaintiff did have an enlarged heart, and given that cardiomyopathy and an enlarged heart go hand-in-hand, the absence of an enlarged heart in March 2009 would have indicated that the plaintiff's condition had

improved.  Accordingly, this argument also is without merit.

Next, the plaintiff appears to argue that the ALJ erred in relying on the X-ray taken at the St. Thomas ER on March 20, 2009 to conclude that the plaintiff condition had improved.  According to the Mayo Clinic:

> An X-ray image shows the size and shape of [the] lungs and heart. In congestive heart failure, [the] heart may appear enlarged and fluid buildup may be visible in [the] lungs.

*http://www.mayoclinic.org/gongestive-heart-failure/diagnosis.html.*  That an X-ray will reveal cardiomyopathy is supported by the fact that another X-ray performed on July 20, 2008 revealed the presence of "cardiomegaly."  (DE 10, p. 209)  Accordingly, the plaintiff's third argument is without merit well.

For the reasons explained above, the plaintiff's third claim for relief is without merit.

### D.  Whether the Appeals Council Erred in Not Considering the April 11, 2011 Letter Written by Dr. Pearce (DE 13, pp. 14-15)

The plaintiff asserts that the letter at issue "contains an opinion that [the plaintiff] is unable to do any physical activity due to his cardiac condition."  (DE 13, pp. 14-15)  According to the plaintiff, the Appeal Council's denial "does not mention and does not evaluate Dr. Pearce's medical opinion, much less explain what weight it was given."  (DE 13, p. 15)

First, the plaintiff's assertion that the Appeals Council did not mention Dr. Pearce's April 11, 2011 letter is not supported by the Record.  The letter in question is listed as one of two exhibits to the Notice of the Appeals Council Action.  (DE 10, p. 5)

To the extent that Dr. Pearce's letter provided new evidence/information not previously before the ALJ, federal courts reviewing claims for Social Security benefits may not reverse an ALJ's decision on the basis of evidence first submitted to the Appeals Council.  *See Cotton v.*

*Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993); *see also Pompa v. Commissioner of Social Sec.*, 73 Fed.Appx. 801, 804 (6th Cir. 2003)(citing *Cotton*). On the other hand, where the Appeals Council denies review, as the final decision of the Commissioner, it is the ALJ's ruling that is subject to judicial review, not the Appeals Council's decision not to review the ALJ's ruling. *See Casey v. Secretary of HHS*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Allen v. Apfel*, 3 Fed.Appx.254, 257 n. 3 (6th Cir. 2001)(citing *Casey*).

Finally, to the extent that Dr. Pearce's April 11, 2011 letter was intended to restate and/or reemphasize his opinions in the medical/clinical treatment records that were before the ALJ then, for reasons discussed *supra* at pp. 17-19, Dr. Pearce's `opinion that the plaintiff was unable to work is not entitled to deference. As previously established, determining whether the plaintiff is disabled rests exclusively with the Commissioner.

For the reasons explained above, the fact that the Appeals Council declined to review the ALJ's decision based on Dr. Pearce's letter does not constitute error. Accordingly, this claim is without merit.

## V. CONCLUSION

None of the plaintiff's claims have merit. Moreover, the ALJ applied the proper legal standards in his decision, and his findings of fact, conclusions of law, and final determination are supported by substantial evidence in the Record.

## Vi. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that the plaintiff's Motion (DE 13) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a

copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 5th  day of February, 2013.

/s/Joe B. Brown_____
Joe B. Brown
Magistrate Judge